Mr. Webb. Thank you, Your Honor. May it please the Court. Taylor Webb on behalf of Quartiz Technologies. We are here today because without injunctive relief, Quartiz Technologies may very well cease to exist. It's our position that the District Court erred in its denial of the requested injunctive relief in two ways. First, Quartiz does have a substantial likelihood of success on the merits because it owns the intellectual property at issue in this case, and North Mississippi Medical Center has no license to that intellectual property. Second, Quartiz does face irreparable harm because it has no adequate remedy at all for the harms that it is facing. So, as to the merits, the District Court does correctly identify what the fundamental issue here is, and that's the interpretation of Paragraph 10 of the Master Services Agreement between the parties. So, Paragraph 10 does a couple of things. First, it grants to North Mississippi Medical Center a non-exclusive perpetual license to copy, reproduce, use, or display the deliverable. So, second, it carves out rights related to two broad categories of intellectual property from that grant of a license. So, the specific language there says that each party shall retain exclusive interest in and ownership of intellectual property that was developed either before the execution of the agreement or outside of the scope of the agreement. So, in analyzing what that provision actually means in terms of the license granted to North Mississippi Medical Center, we've got to look at the words that are in there, and for us, exclusive is really the most important part of it. Now, the dictionary definition of exclusive means that there's just one, not two, not three, and when we're talking about an interest, what we're talking about encompasses any right that a party may have in property, and that would include a license, for instance. So, when you combine those two things together, what you end up with is that Cortez is the only party with any interest, license or otherwise, in those two broad categories of intellectual property. So, our issue with the district court's opinion is that it doesn't mention the word exclusive at all in its analysis of what that paragraph means. It is, of course, reproduced in the court's recitation of what the provision says, but the court makes no attempt to analyze it, makes no attempt to interpret its effect on this carve-out, this exclusive interest provision. And our position on this is that this failure means that the district court just got this one dead wrong, unfortunately. And the plain language of the agreement clearly carves out this intellectual property from whatever license is granted to North Mississippi Medical Center. So, with respect to irreparable harm, Cortez is a PeopleSoft contractor. Now, that's software that is basically a big database, and large institutional entities use this database to, amongst other things, keep track of things like their inventory. In North Mississippi Medical Center's case, we'd be talking about the number of syringes they have on hand, for instance. But the way companies like Cortez get competitive advantages over their rivals, and I should add, there are only around 50 of these companies in the country, and that's a really small pool that's competing for this sort of business. So, the way these companies get competitive advantage over each other is by developing intellectual property. They can use and redeploy from client to client, and this intellectual property sometimes improves the functionality of this PeopleSoft database, sometimes it extends the capabilities of the PeopleSoft database. But ultimately, when these contractors are selling their services to entities like North Mississippi Medical Center, this is in large part what they are selling. They are bringing this intellectual property to the table and leveraging it to provide services for these clients. That's the biggest value that this company has, is that intellectual property. So, imagine what happens when a direct competitor of Cortez gets a hold of this intellectual property. Well, that's actually not theoretical in this case, because North Mississippi Medical Center gave Cortez's intellectual property to Spear MC, one of those 50 or so other companies that is a direct competitor of Cortez's. The ramifications from our perspective are pretty clear. Cortez loses its competitive advantage. It's no longer the only person bringing this intellectual property to the table. This is exactly what the court in AHS staffing, which we rely extensively on in our briefing, says. This sort of disclosure of information like this, intellectual property like this, that may give a direct competitor a leg up . . . likelihood that MC lacked a license to possess or to use a database backup. Or does the database backup contain intellectual property? Now, that needs to be the opening obligation. That's basically the question. If you succeed in that, then . . . Well, your Honor, if I understand your question correctly, this goes back to the fact that . . . back to my discussion previously. Paragraph 10 of the Master Services Agreement provides a license to North Mississippi Medical Center, but that's a very broad grant. It encompasses anything that constitutes the deliverable. Following that grant of the license to North referring to as kind of shorthand, that carves out from whatever license was granted to North Mississippi Medical Center, all of this intellectual property that fits in those two broad categories that I discussed earlier, that was either developed before the execution of the agreement or outside the scope of the agreement. Our position on that issue is that there is no other way to interpret that language than to conclude that that carves out that intellectual property. The district court, we believe, just got it wrong because what they did in their opinion is they didn't discuss exclusive. That is the main thing here because if we don't have the exclusive license, if we don't have the exclusive interest in this intellectual property, then North Mississippi Medical Center can very well have an interest in it. That's easy, but the word is in there. Because the word is in there, what it means is that if North Mississippi Medical Center has a license to this intellectual property that theoretically under the contract my client has exclusive interest in, then they've got a license which under the case law is an interest. Now you have two people that have an interest, not just one, and it's our position because of the language of this contract that only one party can possess an interest in this intellectual property. I don't know any other way to put it, Your Honor, than we believe that the district court just got that one wrong. It's the failure to analyze the effect of the word exclusive that is problematic from our perspective. Speaking to the irreparable harm issue and going back to the ramifications of what happens when this intellectual property is disclosed, Cortez loses its competitive advantage. That's exactly what the court and AHS staffing, which we rely upon, says. Basically that when a direct competitor gets a leg up by obtaining intellectual property like this, that it is on its face irreparable harm because they don't have to . . . Speer MC, the company that received this intellectual property, hasn't spent a dime to develop that intellectual property. They haven't spent a second of their time to develop it. These are the exact same factors that that court analyzed. But despite that, the district court concludes that somehow, well, not somehow, because Cortez can place a discrete value on this intellectual property, that it hasn't suffered irreparable harm. Now, our issue with that is that we think it's a misapprehension of what an adequate legal remedy is. So in the court's opinion, they rely on Dennis Melanson. Judge Stewart, you may correct me on the pronunciation. I understand you were on the panel in that case. Melanson. Melanson. Thank you, Your Honor. In that case, the court was dealing with these ordinances that were imposing requirements on taxicab drivers, taxicab companies, to upgrade their taxis. We're talking about things like credit cards, swiping machines, and the like. And they estimated that would cost $25,000 to $40,000 per vehicle. So the lower court granted an injunction in that case. But when it was brought up on appeal, this court reversed it. And one of the reasons this court identified was that there was going to be a sum certain at the end of the day that these taxicab drivers were harmed. It's the number of cars in your property times the cost to upgrade. And that's it. Unfortunately, Cortez does not have the benefit of that. We can't calculate, despite having a value for the intellectual property, that's not all that the damages here are. We, right now, have no way to restrict what North Mississippi Medical Center is doing with our intellectual property. Nor do we have a way to restrict what Speer MC is doing with our intellectual property. And if somehow we could confine the exposure to that intellectual property just to those two entities and guarantee that, then this argument might not hold much weight. But as it stands, without an injunction, we may very well end up at a scenario some years from now, I would presume, when this case goes to trial, where we can't even realistically figure out where this intellectual property has spread. And all we're asking is to preserve that status quo so we can figure out a number for what the damages are here. And without an injunction, we cannot do that. But how can you do it? Well, Your Honor, I think that would involve a lot of expert testimony, first of all. And you know, each discrete piece of this intellectual property has value, certainly. But the harm is multiplied depending on who obtains this intellectual property. For instance, it's given to another direct competitor of Cortez or two more direct competitors of Cortez. And it all boils down to, how far has this intellectual property gone? How many people have obtained it? What, if anything, have they done with it? And those are questions that I don't believe that we can answer unless we can keep things the way that they are. And currently, we don't have any way to do that. Based on these two, what we believe are clear errors in the application of the law, we request this Court reverse the district court's decision and remand with instructions to enter a preliminary injunction. Unless Your Honors have any further questions, I'll reserve my remaining time. All right. Thank you, sir. We'll hear from Mr. Kaufman. Good afternoon, Your Honors. Andrew Kaufman on behalf of North Mississippi Medical Center. North Mississippi Medical Center is really a health system, although it does operate the largest non-urban hospital in the United States. I think we have a different view of what the issues are in this case. One, there is the issue of, does North Mississippi Medical Center have a license? And we would argue that when the contract says, and let me read so I get it correct, that North Mississippi Medical Center has a perpetual non-exclusive and non-transferable license to use, copy, reproduce, display, or distribute the deliverable, it's very difficult to read the agreement, the master services agreement in any way except to give North Mississippi Medical Center a license. But then, as conceded in the appellate's brief and Cortez's brief, they also need to prove that they have a protectable interest in some intellectual property. And they've argued, well, we have trade secrets and we have copyrights. They only need to show one of those. We say that they haven't done anything to prove either one of those issues. And then third, you get to the irreparable harm. And to us, the irreparable harm is the least interesting and the least likely place for this case to burn. It's really, is there a license or is there not a license? Counsel opposite said that it was the word exclusive that was important in that sentence that he points to, which comes from paragraph 10. But it's really the word interest that's important. What does that interest mean? I have an interest in the Royals and the Yankees playoff series, but I certainly don't have any ownership in that. It certainly doesn't affect anyone else's ownership. Under the terms of this agreement, Cortez operated North Mississippi Medical Center's PeopleSoft database. They did that at North Mississippi Medical Center in 2018, in 2019, and then in 2020, they moved it into the cloud. Well, as part of that, they have all of North Mississippi Medical Center's data from 1994 until the present. How many bandages did you buy? How many aspirin did you buy? How much was every person paid? What were your taxes? That's what PeopleSoft is. It's the largest enterprise resource software used in the United States. Oracle product that's been around either since the 1970s or 1980s. We would say that Cortez has the right to see that data under the terms of the services agreement, but we're the only party that has an interest in the data, even though they're working with it. But Cortez wants there to be this specialized reading of the word interest. But Cortez is, as Judge Reeves-Blow found, Cortez is the party that drafted this agreement. And Cortez, as this case started, originally North Mississippi Medical Center filed the case. We argued that Cortez was refusing to return our database to us because North Mississippi Medical Center has the license with Oracle and Cortez operates under our license, and they refused to give us the database back. Their given reason was that they had this intellectual property, and they filed these counterclaims. But when they filed the counterclaims, they didn't mention this exclusive interest language. They hadn't come up with that argument yet. And now they're saying, as a matter of law, this is what the agreement means. So as set forth in our brief, when Cortez, who drafted the agreement, said that they had intellectual property, first they said the Master Service Agreement doesn't contain a license at all. Obviously that's contradicted by the language of it. Then they said, well, North Mississippi Medical Center's liability is really through the NDA that was signed during the negotiation period before the license, but the license in the MSA is also accompanied by an integration clause, and relying on Judge Rowe's non-disclosure agreement has no effect, no force anymore, and they've abandoned that argument. Then they argued, well, the Master Service Agreement is not the special kind of license that you need when you license source code, but the Master Services Agreement makes no distinction between source code or object code. And then, and this is really what Judge Reeves had before making the decision. He had four days of hearings on the competing preliminary injunctions in this case, and he asked the representative from Cortez, really the only member of the LLC that is Cortez, what is license then? What does this license language mean if you've retained an exclusive interest? And as Judge Reeves wrote on, and this is 1540 of the record, the best explanation Cortez could muster for this language is that, and then he quotes, the license to use that service will no longer be valid, close quote, when North Mississippi Medical Center, again quoting, stops paying Cortez or there is a delinquency, close quote. And then Judge Reeves said, but that's not what a perpetual license means, right? So at the hearing, Cortez hadn't come up with this argument. This was one of a half dozen arguments. Their witness, who is the person, you know, responsible for their whole company that drafted this agreement, said it meant something different than what they're arguing today. They've also argued that the license only applies to intellectual property that would be owned by North Mississippi Medical Center. That's not what they called it. What they said is, well, it would only be a license for software that you hired us to build. The problem with that is that the Master Services Agreement doesn't ask them to write any code. It doesn't ask them to build any software. And if they did, that would qualify as a work for hire. And we briefed this in the court below, and then they abandoned that argument. We briefed this in our response, and they don't address it in their reply brief. And it was only at that point that they got to the exclusive interest language. And so really the argument they're making is a proper argument about whether they could survive a motion to dismiss, whether they have a plausible claim. And that's currently pending in the district court below. They've amended their complaint four times, so it's taken a long time to get to the Rule 12 motions here. But there's currently, you know, we have filed a Rule 12b6 saying, look, you can only read this agreement in one way, which is to give North Mississippi this very broad license. They have an argument, at least that they might have plausibly stated a claim that it could be read another way. But that's very different than developing a substantial chance to prevail or substantial likelihood that they're going to prevail on the merits, especially as Judge Reeves found that as the drafters under Mississippi law, if it's not in the plain language of the contract, then the contract has to be read against Cortez. But you think they're having irreparable injury? No, I disagree that they have irreparable injury. You said that was the least... I think that's... I don't think the case is likely to turn on the irreparable injury. I think it's more likely to... Do you stress it, though, if you think that they could get money if they're right? So we also think that they don't have any, quote-unquote, intellectual property in this database as it exists. And we briefed that. But counsel opposite said that Cortez owned this intellectual property. But we know that's not correct. They actually moved to dismiss North Mississippi Medical Center's complaint, saying we hadn't sued the essential parties because it's other individuals that created this supposed intellectual property, so these third parties. So there's a really big question about whether, if they're operating under copyright law, normally only the beneficial owner of a copyright can bring an action for copyright harms. And they're not the beneficial owner. They say that this is trade secret. And it's true, you don't have to own a trade secret in order to bring a claim. We don't dispute that. But there are lots of good reasons to think that it's not trade secret, including the fact that they have no written agreements with the people that actually created this code, who are independent contractors, not their employees. And as the testimony showed, their own testimony, those contractors are sharing this code with others. They're hired on a contract basis for Cortez, so they may have done some work for North Mississippi Medical Center, put some code into the backup database, but they also do that for other clients, both other companies like Cortez that operate in this marketplace, but also direct clients that hire them to do work. My question is about irreparable harm versus money, the argumento that they are... So we would say that they don't have any grounds to raise any harm at all, irreparable or otherwise, for copyright or trade secret harm, because they don't have, well, I don't... Okay, but I'm saying if we were to conclude that they did show a substantial right, then what about the fact, the money versus irreparable? That's my question. I realize you don't want to get to this or that, you think you should win already, but I'm getting a little down further the road, so... And I apologize for not... I really was trying to answer your question there, but let me get to what I think you're talking about, which is you find that they have a trade secret, they have a copyright, North Mississippi Medical Center does have a license. Well, number one, this existential harm that was the opening of this argument, as Judge Reeves said, the first time that that was ever mentioned in his courtroom, in these four days of hearings, was in the closing arguments that he allowed us to make. There were no witnesses about that. Cortez has these 50 or 60 competitors. We put on an expert witness from one of these competitors who said, we would never consider any of this to be proprietary to us in any way. It's no different. Every company that does this is able to accomplish these same sort of tasks. And Cortez has been in business since 2015. It's a one-man shop. In that time, there's testimony that they've only ever had seven to eight customers. Only three of the clients that they worked with did they provide the type of services that they provided to North Mississippi Medical Center, and North Mississippi Medical Center is their last client. There is no irreparable harm. We're going to go out of business. The only reason they're in business is because they're holding North Mississippi Medical Center's database hostage, and we're continuing to pay them $50,000 a month for the privilege of having access to  So you're saying if they succeed on the merits, they should get no injunction and no money? That's correct, Your Honor. Okay. Well, I can see why they say they're not able to get money. So we don't think that there is no business for them to lose. They're not out there in the marketplace with any competitive advantage. They haven't shown that this code has anything special about it that would give them a competitive advantage. And there's just no testimony other than from Eldo Matthew, who's the individual that owns the company, and there's good reason. We're here on an abuse of discretion standard. Judge Reeves have to . . . What does he mean then? He's describing this small universe of fifty entities in the United States, whatever. You heard the argument saying this is a very limited domain that it's in, and part of its harm is that if that's altered, then it just opens up Pandora's box in terms of harms that are everywhere. They can't calculate them later, yada, yada, yada, and all that. So, I mean, what does that number 50 mean? I'm not trying to characterize his argument, but he said it's a universe of 50. Very exclusive. Maybe I shouldn't use that word, but 50 small whole United States that they're in, and that's in danger, if you will, by what's going on. So, what does that mean in light of your argument that they have no protectable interests here and that this agreement is allowing lots of things to occur anyway? So, PeopleSoft is a database in the same way that Excel is a database. Obviously, PeopleSoft is more sophisticated. So, lots and lots of companies license it, and they operate it themselves, or they don't need any special operation. They're using out of the box. There are 50 or 60 companies that provide the kind of services that Cortez provides. None of them would be affected by this decision at all. I mean, this only really affects Cortez, and some of those companies are themselves huge. The largest one is a company called Remedy Street, and I can tell you how large they are based on Oracle's lawsuit against them, in which Oracle was awarded more than $100 million, and just last week was awarded $70 million in fees in a copyright infringement matter, because they said, really, what you're changing about our database, the way you're saving things, is copyright infringement of the database as well. So, there are thousands and thousands and thousands of companies that use these kind of services. Cortez services one company, North Mississippi Medical Center, and in its entire life, in those nine years, it's only served seven or eight, and only three for the type of work it did for North Mississippi Medical Center, because sometimes it's small project work. So, that's what we would say, is there's not any real harm out there, right? What damages could they show? None, because we have a term contract. The term expired. North Mississippi Medical Center wants to stop using Cortez's services. Cortez doesn't have any other businesses, and the only testimony that they had a competitive advantage, as I said, came from Eldo Matthew. He also testified that PeopleSoft didn't work, that it was only his company that could make it work, despite the fact that it is a 40-plus-year-old software licensed by, and we heard testimony about Boston Consulting, some of the biggest companies in America that use it. Mr. Matthew also testified that Amazon Web Services, that their software didn't work, and it was only his special expertise that could make Amazon Web Services, the cloud computing giant, work, despite the fact that we have a SAL, a statement of work that's attached to this master services agreement, which defines Amazon Web Services as the nation's leading provider of cloud computing, right? I mean, that's the words they put in the contract when they were entering a contract to move North Mississippi Medical Center's instance to the cloud. Um, so, you know, Judge Reeves had to make factual determinations about who to believe, and we're here on an abusive discretion review, and it was reasonable for him to discount everything that Mr. Matthew said, because it's simply not believable to say PeopleSoft doesn't work, Amazon Web Services doesn't work, I'm the only one that can make these products work. So, to get to what I think is, is the other two important issues on the likelihood of success on the merits are, is the software copyrightable? And the answer to that is, I don't know, because we know others use this same soft, use, do these same things, whether that's through the same expression or not, there's no evidence of it. Mr. Matthew testified, no, our code is unique, but then he also testified, well, I don't know what code the others use. Um, no code was put into the record, no expert opinion was given that the code was, it's somehow different from others, in the same way that, you know, novels are generally subject to copyright protection, but it's certainly possible one could write a novel that wasn't subject to copyright protection. There's also testimony that one of these third party contractors, the people that actually wrote the code, started writing the code while he was an employee of Oracle, which opens up a big question about whether that was a work for hire, you know, that Oracle owns, um, when he was an Oracle employee when he started working there. This lawsuit started because North Mississippi Medical Center has its PeopleSoft database with Cortez, wanted to get the database back, and so instead of giving you your database back, we're going to give you an Excel spreadsheet with every purchase, every sale, every tax document since 1994. Mr. Matthew, um, answered that the code was inter, um, uh, was intertwined in Oracle's code, um, so it couldn't be removed. Now, he tried to clean that up when his lawyer asked him some questions about it, but that's what the facts are, right? The facts are, they've said to the court, we can't remove it. This court hasn't addressed that, but the 2nd, 6th, 7th circuits and the Southern District of Texas and the Nemer Treatise all agree that when code is so, um, inextricably intertwined, uh, derivative work code in the, the original work, that it can't be protected by copyright. And on the trade secret issue, we think as a matter of law, there are no trade secrets. There's an argument that they've stated a plausible trade secret claim, but they don't have any confidentiality agreements with other people that we know are using this code with others and have no obligation to keep it secret. Um, and for that reason, both their, uh, Defend Trade Secrets Act claims, um, and any reliance on, and their Mississippi Trade Secrets Act claims should fail. And for those reasons, we would ask this court to affirm Judge Reeves and send this case back, um, for further resolution. So at stake here is the existence or not of a preliminary injunction. There's more to go on later, right? Yeah, that, that's correct, Your Honor. So we, we are, we are the plaintiff, uh, and, and counter defendant. The, we don't have anything on appeal, so all our claims are still pending and they're pending motions to dismiss. There's now a new party that's been or we'll all take discovery and find out the right answer. All right. Gotcha. Thank you. All right. Back to you, Mr. Webb. Now, Mr. Webb, I got to ask you, I mean, I know you started off saying everything should flow from this one word, but let's, let's not go there. But on the question of irreparable harm, the district court did find, assuming everything else, the courts has an adequate remitted law, those monetaries it might prove up during the remainder of this suit. And he concluded that after a full evidentiary hearing, hearing from your witness, Mr. Matthew, et cetera, et cetera, and finding that compensatory relief would be available assuming everything else was satisfied. So that's a determination made after an evidentiary hearing, fact findings, et cetera, et cetera. So what's the reversible error? Your Honor, this is what I was discussing earlier when I brought up the Melanson, Melanson case. So the distinguishing part in that case . . . Now, don't tell me about the case. Tell me about what I just asked you. So the difference and the problem here is that we don't have a sum certain that we know we can calculate at the end of the . . . But I'm reading from the record. He says that there isn't, while Matthew explained that his company has not placed monetary values on the alleged intellectual property, he did not avert that the information was so valuable as to be incalculable. Indeed, his testimony revealed the value of the intellectual property court is used in the NMNC project could be determined by comparing similar services offered by Oracle, the owner of the PeopleSoft platform. The fact that adequate compensatory relief will be available later weighs heavily against the claim of irreparable harm. And then he cites Melanson. So I'm just saying he makes a determination based on what your witness testified that while it may be difficult to calculate, that's not to be confused with impossible. And quintessential to showing irreparable harm is that it cannot be calculated. So I'm asking you based on an evidentiary record that you're in there to get injunctive relief. The district court concludes that compensatory relief could be available if you're . . . How do you satisfy the hurdle that that's reversible error? Your Honor, the issue for us is that although we can value this software, let's say you pay a price for a license to the software, right? We do not dispute that. We agree with the district court. That is the testimony. The issue becomes that's not our damages figure. The damages figure is derived when we look at how far this intellectual property has spread. But he says in there, after all, Matthew himself testified that much of the code used in MMC Project does not even belong to Cortes. Cortes does not, he explained, have written agreements with any of the other owners of the intellectual property to work exclusively with Cortes. And all of them have other possible PeopleSoft projects. I'm just struggling with this exclusivity that you're saying. In the district court, I'm reading the words. It appeals from the judgment, not from the reasons. That's axiomatic. But at bottom, there's a preliminary injunction hearing. There were witnesses. You're arguing some existential damage, something incalculable. I'm just trying to understand based on the standard review that we apply, how do you get over the hump in terms of not what he didn't say, not what he didn't talk about, but the hearing? That's correct. If damages are calculable, then . . . So there are a couple of issues with the factual findings that Judge Rees made there. First, and this has to do with something counsel opposite brought up, the finding that there is testimony that has been given that these co-owners of this intellectual property are to distribute this intellectual property to whoever they so choose. That's not what the record says. The record, in fact, shows that the testimony was that these co-owners can disclose intellectual property that only they themselves, without Cortes. So that's one of the distinguishing features. And again, Your Honor, I would suggest that the court's error from a legal standpoint with respect to the conclusion there is that the damages are not based solely on the value, the numerical value for that intellectual property. And the issue we face and what causes us irreparable harm is the fact that we can't calculate that because we don't know how far it is spread. Well, you're just talking about something that may take a huge calculator or computer to figure as opposed to being able to do it on your thumbs and fingers. That's still not addressing the question of whether damages are allowable. However, it may, you said, or somebody said, that may be a function of expert witnesses. That's different than trying to get a preliminary injunction saying irreparable harm. There is no way money can satisfy it. And that was part of the hearing. It's difficult to say the district court didn't reach this, the district court didn't address it, there's no evidence on it. In this record, it's there. You've got a full hearing. You're on appeal saying we should reverse the determination because you show unquestionably irreparable harm. And I haven't heard you yet go back against, much less address with counsel. So I've just given you, I'll give you a minute extra just to respond to that. I know I put a lot at you, but I'm just disappointing us reading all this before we come in here. Thank you, Your Honor. So I would point out that even if we're talking, even when we're talking about irreparable harm, the availability of money damages isn't the end of the inquiry there. Even if money damages are available, the harm can still be irreparable. We briefed a great case there that talked about it. That sounds like speculation, Mr. Amadou Spill. That sounds like speculation. You're talking about what could be. Well, Your Honor, in certain circumstances, and this is another issue that we bring up in our briefing, is that we face irreparable harm from the potential damage to Cortez's relationships with its contractor. Potential. Speculative. Yes, Your Honor. The case law on that point is clear that even the risk of reputational injury is enough. I'll give you one minute to sum up. Thank you, Your Honor. I do want to go back to the point that these are co-owners of this intellectual property. This intellectual property was not developed solely by those other contractors that counsel opposite referenced. I do want to read one, what I think is a very important exchange with North Mississippi Medical Center's own expert witness in response to the question about the intellectual property here. When he was asked whether Cortez's intellectual property was in this database, he responded, yes. Then counsel opposite further examined him, asking him what he meant by intellectual property. Their own expert witness responded, something that's unique to the company. They have full rights on that, and that cannot be duplicated. Your Honor, we don't think there's any question here that we've satisfied what the district court aired when they reached these decisions on the irreparable harm prong and the substantial likelihood of success on the merits prong. All right, Mr. Webb. We have your argument and your briefing. We appreciate the zealousness in which all counsel represent their particular positions. It's helpful to us. Thank you from both sides. We'll consider the case submitted, and we'll get it decided. All right. Counsel may be excused.